1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7   GREENLIGHT SYSTEMS, LLC, et al.,        Case No. 19-cv-06658-EMC

8                    Plaintiffs,

9          v.                                ORDER GRANTING COUNTER-
                                             CLAIMANT'S MOTION FOR
10  ERIK BRECKENFELDER,                      DEFAULT JUDGMENT

11                   Defendant.              Docket No. 95

12

13

14        Plaintiffs Greenlight Systems, LLC ("Greenlight") and Orbital Asset Holdings, Inc.

15  ("Orbital") sued Defendant Erik Breckenfelder for fraud and breach of contract related to their

16  employment agreement.  *See* Docket No. 2 ("Compl.").  Mr. Breckenfelder raised several contract

17  and employment counterclaims against Plaintiffs and their president/CEO, Andrew D.B. Rowen

18  (collectively, "Counter-defendants").  *See* Docket No. 17 ("Countercl.").  The Court dismissed

19  Plaintiffs' Complaint, entered default on Mr. Breckenfelder's counterclaims against Counter-

20  defendants, and awarded Mr. Breckenfelder attorneys' fees.  *See* Docket Nos. 33, 84, 89.  The

21  Court also held an evidentiary hearing on May 7, 2021, to prove up Mr. Breckenfelder's damages.

22  *See* Docket No. 95.

23        Before the Court is Mr. Breckenfelder's motion for default judgment on his counterclaims

24  pursuant to Federal Rule of Civil Procedure 55.  *See* Docket No. 95 ("Mot.").  For the following

25  reasons, the Court hereby **GRANTS** Mr. Breckenfelder's motion and enters default judgment in

26  the amount of $691,384.3 against Counter-defendants.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

# I.     FACTUAL AND PROCEDURAL BACKGROUND

A.     Factual History

In his counterclaim, Mr. Breckenfelder alleges as follows.

Mr. Breckenfelder is a longtime sales representative with extensive experience in the automotive industry.  Countercl. ¶ 11.  As of April 2019, Mr. Breckenfelder had been employed for about three and a half years at CCC Information Services, Inc. (CCC) as a National Sales Director in Chicago.  *Id.* ¶ 12.  His 2019 compensation at CCC was expected to be approximately $400,000 in salary and bonuses.  *Id.*; Docket No. 98 ("Breckenfelder Decl.") ¶ 4.  Andrew Rowen is the president of Orbital, a California corporation, and the CEO of Greenlight, an Ohio limited liability company.  Countercl. ¶¶ 8-10.

In late April 2019, Jake Tullis, an agent of Mr. Rowen and Orbital, contacted Mr. Breckenfelder through LinkedIn.  *Id.* ¶ 15.  Mr. Tullis asked if Mr. Breckenfelder would be interested in working at a new company called Greenlight Systems, which provided service department software to car dealerships.  *Id.*  Mr. Breckenfelder was not seeking new employment and did not initiate contact with any of the Counter-defendants.  *Id.*  Prior to Mr. Tullis's call, Mr. Breckenfelder did not know of Mr. Rowen or Greenlight.  *Id.*

Between late April and July 1, 2019, Mr. Rowen and Mr. Tullis represented to Mr. Breckenfelder that Greenlight owned a fully functional software designed for the specific needs of automobile dealers, that it had been "alpha, beta, and pilot tested" in dealerships, and that it was ready to be sold and deployed.  *Id.*  Both Mr. Rowen and Mr. Tullis communicated this information to Mr. Breckenfelder over telephone calls, email, and text messages.  *Id.*  They offered Mr. Breckenfelder a salaried position as a senior executive of the new Greenlight company.  *Id.*  Mr. Breckenfelder would oversee the marketing and selling of Greenlight's software.  *Id.* ¶¶ 15-16.  The position would include additional merit-based compensation, equity compensation for meeting sales milestones, and an opportunity to purchase an additional "2.5% share of ownership in the Employer."  *Id.* ¶ 17.  The compensation for this position was largely dependent on successfully selling Greenlight software.  *See id.* ¶¶ 17, 27.

If Mr. Breckenfelder accepted the position, one of his responsibilities included managing

2

an existing sales team, which "was already on the verge of closing a number of sales." *Id.* ¶ 18. Mr. Breckenfelder was concerned that he would not have adequate resources or support to do the job. *Id.* To alleviate Mr. Breckenfelder's concerns, both Mr. Rowen and Mr. Tullis told him that they had already invested substantial capital into the company and had acquired "multiple human resources" to grow the company. *Id.*

Orbital and Mr. Rowen also stated they would be willing to sell Mr. Breckenfelder an equity stake in the new Greenlight company. *Id.* ¶ 17. They mentioned that Greenlight had a fair valuation of $12.5 million and asked Mr. Breckenfelder to wire $50,000 to Orbital as a down payment on the 2.5% share of ownership in the company. *Id.*

Based on Orbital's and Mr. Rowen's representations, Mr. Breckenfelder quit his job at CCC on July 12, 2019 to accept at-will employment as an executive at the new Greenlight company. *Id.* ¶ 19; Breckenfelder Decl. ¶ 4. Mr. Breckenfelder also wired a total of $50,000 to Orbital as an initial payment for an equity interest in the new Greenlight Systems entity. Countercl. ¶ 19.

According to Mr. Breckenfelder, Orbital and Mr. Rowen's representations to him about Greenlight, especially its software, employees, and valuation, were false and Counter-defendants knew it. *Id.* ¶¶ 17-18, 20. First, Mr. Breckenfelder alleges that Counter-defendants knew the Greenlight software was not fully functional because they had failed repeatedly to successfully deploy it at automotive dealerships around the country. *Id.* ¶¶ 20-24. The software lacked basic functionality. *Id.* As of late 2017, Patrick Day, an individual who worked with Mr. Rowen to develop the Greenlight software, stated under oath that the product was "unsaleable" and "[could not] be 'rolled out' and installed at a customer location without significant additional work to make it ready and saleable." *Id.* ¶ 20. Despite all these software problems, Counter-defendants did not disclose this information to Mr. Breckenfelder. *Id.* Counter-defendants were also aware, but did not tell Mr. Breckenfelder, that most or all the people responsible for designing and marketing the Greenlight software were no longer employed by Greenlight. *Id.* ¶¶ 14, 25. In fact, several of them had been sued by Mr. Rowen. *Id.* ¶ 25.

Second, Counter-defendants allegedly stated there was an existing sales team and that they

United States District Court
Northern District of California

had hired "multiple human resources." *Id.* ¶ 18.  But once Mr. Breckenfelder started working at Greenlight, he soon learned he was the only employee at the company.  *Id.*  There was no formal sales team.  *Id.*  Instead, there were three individuals, all operating on a short-term "letter of understanding," who had made a couple of contacts with automobile dealerships but had no pending deals.  *Id.*

Third, Mr. Breckenfelder alleges the company valuation appeared unsubstantiated.  *Id.* ¶¶ 17, 26.  Mr. Rowen and Mr. Tullis told Mr. Breckenfelder that the company valuation had been performed by a third-party appraiser, but this seemed unlikely.  *Id.*  At the time the representation was made, Greenlight was not even a formal entity, as Greenlight was not registered as a limited liability company (LLC) until August 2019.  *Id.* ¶ 26.  Moreover, Counter-defendants had no reasonable basis for believing that Greenlight could be worth $12.5 million because the company had a non-functional software, no assets, no sales, and no pending customers.  *Id.*  Additionally, after wiring the $50,000 payment for an equity stake in Greenlight, the Counter-defendants never gave Mr. Breckenfelder his share of the company.  *Id.* ¶ 61.

Mr. Breckenfelder started working at Greenlight on July 15, 2019.  *Id.* ¶ 71.  He tried to market and sell the company's software by setting up pilot installations at dealerships in Chicago, Illinois and Grandville, Michigan.  *Id.* ¶¶ 28, 32.  During these pilots, Mr. Breckenfelder started learning about the software's functionality issues.  *Id.* ¶¶ 28-31.  For example, the software could not operate on Internet Explorer, the browser used by many car dealerships.  *Id.* ¶ 30.  The problems that occurred in the Chicago and Grandville pilot installations were the same issues that had plagued the Counter-defendants in their earlier pilot runs.  *Id*. ¶ 32.  During his employment, Mr. Breckenfelder repeatedly shared his concerns about the software with Mr. Tullis and Mr. Rowen.  *Id.* ¶ 33.

On or about September 18, 2019, in a call with Mr. Rowen, Mr. Tullis, and Moris Davidovitz, Mr. Rowen's attorney, Mr. Breckenfelder announced he was resigning his employment.  *Id.* ¶ 34.  Due to the software problems, Mr. Breckenfelder told Mr. Rowen that he "could not in good conscience" ask his industry contacts to use this software on a trial basis.  *Id.*  Subsequently, Mr. Rowen allegedly attempted to extort Mr. Breckenfelder by threatening to sue

1    him if he did not perform tasks for no compensation and make additional monetary payments to

2    Greenlight.  *Id.*  In another conference call on September 25, 2019, Mr. Rowen told Mr.

3    Breckenfelder, "[y]ou tried to kill the King, but you failed and now the King is going to kill you,

4    but first he is going to torture you in court for many years." *Id.* ¶ 26.  Ultimately, Mr.

5    Breckenfelder worked for Greenlight for only nine weeks (from July 15 to September 18, 2019),

6    without receiving any compensation.  *Id.* ¶ 37.  Mr. Rowen continued to send Mr. Breckenfelder

7    harassing emails and texts, repeatedly threatening to sue Mr. Breckenfelder.  *Id.* ¶ 38.

8    B.    Procedural History

9         On October 16, 2019, Greenlight and Orbital filed suit against Mr. Breckenfelder for fraud

10   and breach of contract related to the parties' employment agreement.  *See* Compl.  On December

11   4, 2019, Mr. Breckenfelder filed an answer and counterclaims, which named Mr. Rowen as an

12   additional Counter-defendant.  *See* Countercl.  These counterclaims alleged that the Counter-

13   defendants made false misrepresentations to induce Mr. Breckenfelder to accept employment with

14   them, never paid him for his work, and took $50,000 from him.  *Id.* at 2.  On December 28, 2019,

15   Counter-defendants filed an answer to the counterclaims.  *See* Docket No. 20 ("Answer").

16        As the litigation proceeded, Plaintiffs/Counter-defendants repeatedly failed to respond to

17   discovery requests, in violation of several orders from this Court.  *See* Docket Nos. 24-25, 29-31.

18   As a result, the Court dismissed Plaintiffs' complaint and awarded Mr. Breckenfelder attorneys'

19   fees on May 28, 2020.  *See* Docket Nos. 33, 35.  On June 30, 2020, the Court maintained

20   jurisdiction over Mr. Breckenfelder's counterclaims.  Docket No. 40.

21        On July 9, 2020, the Court issued a new order requiring Counter-defendants to "comply in

22   full" with all their discovery obligations by August 23, 2020 or risk entry of default on Mr.

23   Breckenfelder's counterclaims against them.  Docket No. 45.  The Court even granted Counter-

24   defendants an extension until September 10, 2020 to comply with all outstanding discovery

25   requests.  *See* Docket Nos. 49, 51.  Counter-defendants failed to comply with the orders.  Instead

26   of complying with the discovery orders, Counter-defendants filed a motion for relief from

27   dismissal and to continue trial.  *See* Docket No. 55.  The Court denied this motion on October 6,

28   2020 because Counter-defendants had failed to show either "excusable neglect" or "other reasons

United States District Court
Northern District of California

5

1   justifying relief."  Docket No. 77.

2       Due to Counter-defendants continued non-compliance with discovery, the Court entered

3   default on Mr. Breckenfelder's counterclaims on November 17, 2020.  Docket No. 84.  The Court

4   also notified Mr. Breckenfelder that he was free to move for entry of default judgment and granted

5   additional sanctions against the Counter-defendants.  *See* Docket Nos. 74, 86, 88-89.

6       On January 28, 2021, Mr. Breckenfelder filed a motion for entry of default judgment on

7   his counterclaims against Counter-defendants.  *See* Docket No. 95.  The Court held an evidentiary

8   hearing to prove up Mr. Breckenfelder's damages on May 7, 2021.

9                          **II.    DISCUSSION**

10  A.   Requests for Judicial Notice

11      Mr. Breckenfelder has submitted two requests for judicial notice with his motion for

12  default judgment.  Docket No. 96 ("RJN").  First, he asks the Court to take notice of a related

13  lawsuit, *Rowen v. Ansari, et al.*, No. 3:17-cv-05029-LB (N.D. Cal. filed Aug. 30, 2017) (Beeler,

14  M.J.), including statements made in sworn declarations by Mr. Rowen and his employees.  *Id.* at

15  1-3.  Second, Mr. Breckenfelder asks the Court to take notice of records from the websites of the

16  Ohio and Montana Secretaries of State, which purportedly state that Greenlight Systems, LLC was

17  registered in Ohio on August 6, 2019 and in Montana on July 22, 2020.  *Id.*  Counter-defendants

18  do not oppose either request for judicial notice.  *See generally*, Docket No. 99 ("Opp'n").

19      Federal Rule of Evidence 201 allows a court to take judicial notice of facts that are "not

20  subject to reasonable dispute because they: (1) are generally known within the trial court's

21  territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

22  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

23      Regarding Mr. Breckenfelder's first request, the Court takes judicial notice of the *Ansari*

24  court documents, but not for the truth of the statements within them.  *See Lee v. City of Los*

25  *Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (courts may "take judicial notice of *undisputed* matters

26  of public record," but generally may not take "judicial notice of *disputed* facts stated in public

27  record"); *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007) (court took notice of prior

28  lawsuits but refused to take notice of facts from plaintiff's deposition because "the accuracy of the

6

deposition excerpts . . . could be subject to reasonable dispute”).  Courts may take judicial notice of “court filings and other matters of public record.”  *See Reyn’s Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746, n.6 (9th Cir. 2006) (taking judicial notice of another lawsuit’s litigation filings, such as pleadings, memoranda, and expert reports).  However, courts generally may not take notice that the contents of these court documents are true.  *See M/V Am. Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983); *Petrovich v. Ocwen Loan Serv., LLC*, No. 15-CV-00033-EMC, 2016 WL 555959, at *4 (N.D. Cal. Feb. 12, 2016) (“Notice can be taken, however, not for the truth of the matters asserted in the litigation, but rather to establish the fact of such litigation and related filings.”); *Lee*, 250 F.3d at 689-90 (court could take judicial notice of the fact that there was an extradition hearing, that an extradition waiver was signed, and that the defendant purportedly waived his rights, but erred when taking judicial notice of the waiver’s validity because validity was a disputed fact).  Thus, for the *Ansari* case, the Court takes judicial notice that Mr. Rowen brought the lawsuit in his own name and that he filed declarations.  *See Azoulai v. BMW of N. Am. LLC*, No. 16-CV-00589-BLF, 2017 WL 1354781, at *4 (N.D. Cal. Apr. 13, 2017) (court may take judicial notice of declaration but not the truth of its allegations).  However, the Court will not take notice that the contents of the declarations are true.  *See id.*  Nonetheless, statements by Counter-defendants in this case made in other cases (of which judicial notice is taken) may be considered as admissible evidence – they are statements of a party opponent. Fed. R. Evid. 801(d)(2).

The Court also takes judicial notice of the Ohio and Montana Secretaries of State’s records.  *See Farina Focaccia & Cucina Italiana, LLC v. 700 Valencia St. LLC*, No. 15-CV-02286-JCS, 2015 WL 4932640, at *4 (N.D. Cal. Aug. 18, 2015) (taking notice of documents on Secretary of State’s website); *Paralyzed Veterans of Am. v. McPherson*, No. C064670SBA, 2008 WL 4183981, at *5-6 (N.D. Cal. Sept. 9, 2008) (same).  These records are public documents, and they are not in dispute, nor is there doubt of their accuracy.  *See id.*

B.    Merits of Default Judgment Motion

As noted above, the Clerk of the Court entered default on Counter-defendants’ counterclaims on November 17, 2020.  Docket No. 84.  After entry of default, a court may enter a

1    default judgment on the merits of the case.  *See* Fed. R. Civ. P. 55.  The decision "to enter a

2    default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

3    When determining whether to enter a default judgment, courts consider the following seven

4    factors:

5            (1) the possibility of prejudice to the plaintiff, (2) the merits of
             plaintiff's substantive claim, (3) the sufficiency of the complaint, (4)
6            the sum of money at stake in the action, (5) the possibility of a
             dispute concerning material facts, (6) whether the default was due to
7            excusable neglect, and (7) the strong policy underlying the Federal
             Rules of Civil Procedure favoring decisions on the merits.

8

9    *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  Since default has already been entered

10   in this case, the Court must construe "the factual allegations of the complaint, except those relating

11   to the amount of damages," as true.  *See Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir.

12   1977).  "However, necessary facts not contained in the pleadings, and claims which are legally

13   insufficient, are not established by default."  *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261,

14   1267 (9th Cir. 1992).

15           In this case, all the *Eitel* factors support entry of a default judgment.

16           1.    First Factor:  Possibility of Prejudice

17           The first *Eitel* factor weighs in favor of default judgment because Mr. Breckenfelder would

18   likely be left without a remedy if the Court denies the instant motion.  *See Walters v.*

19   *Shaw/Guehnemann Corp.*, No. 03-cv-04058, 2004 U.S. Dist. LEXIS 11992, at *7 (N.D. Cal. Apr.

20   15, 2004).

21           2.    Second and Third Factors:  Merits and Sufficiency of Plaintiff's Substantive Claims

22           The second and third *Eitel* factors—the substantive merit of the plaintiff's claims and the

23   sufficiency of the pleadings to support those claims—also weigh in favor of default judgment.

24   782 F.2d at 1471.  Since the Court entered a default on Mr. Breckenfelder's counterclaims, his

25   well-pleaded allegations are accepted as true.  *See Geddes*, 559 F.2d at 560.  Based on this

26   standard, Mr. Breckenfelder has sufficiently pled his fraud, conversion, and minimum wage claims

27   under Federal Rules of Civil Procedure 8 and 9(b).  *See Willamette Green Innovation Ctr., LLC v.*

28   *Quartis Capital Partners*, No. 13-cv-848-JCS, 2014 U.S. Dist. LEXIS 148665, at * 17 (N.D. Cal.

United States District Court
Northern District of California

8

1    2014).  This order will address the sufficiency of each claim in turn.

2              a.    Fraud

3         Mr. Breckenfelder brings two fraud claims based on intentional and negligent

4    misrepresentation.  Countercl. ¶¶ 40-59.  Federal courts look to state law for the elements of a

5    fraud claim.  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126 (9th Cir. 2009).  The elements of

6    intentional misrepresentation in California are: (1) misrepresentation, such as through false

7    representation, concealment or nondisclosure; (2) knowledge of falsity; (3) intent to induce

8    reliance; (4) justifiable reliance; and (5) resulting damage.  *See Engalla v. Permanente Med. Grp.*,

9    Inc., 938 P.2d 903, 917 (Cal. 1997).  The elements for a negligent misrepresentation claim in

10   California are similar, except that the second prong requires that the "defendant lacked reasonable

11   grounds for believing the representation to be true."  *R Power Biofuels, LLC v. Chemex LLC*, No.

12   16-CV-00716-LHK, 2016 WL 6663002, at *11 (N.D. Cal. Nov. 11, 2016) (citing *Nat'l Union Fire*

13   *Ins. Co. of Pittsburgh, PA v. Cambridge Integrated Servs. Grp., Inc.*, 89 Cal. Rptr. 3d 473, 483

14   (Ct. App. 2009)).

15        In federal court, fraud claims are held to a heightened pleading standard under Rule 9(b),

16   which requires a party state "with particularity the circumstances constituting fraud or mistake."

17   Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("Rule

18   9(b)'s particularity requirement applies to state-law causes of action").  To satisfy this

19   requirement, the plaintiff must provide "the time, place, and specific content of the false

20   representations as well as the identities of the parties to the misrepresentation."  *Schreiber Distrib.*

21   *Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

22        Mr. Breckenfelder has plausibly pled his fraud claims because he alleges Counter-

23   defendants knowingly made specific false statements about their company that convinced Mr.

24   Breckenfelder to accept employment at Greenlight.  *See Lazar v. Sup. Ct.*, 909 P.2d 981, 985 (Cal.

25   1996) (employer's intentionally false representations about workplace conditions and company's

26   financial strength established elements of fraud).  First, Mr. Breckenfelder alleges Counter-

27   defendants falsely stated that Greenlight's software was fully functional, Greenlight had an

28   existing sales team for Mr. Breckenfelder to manage, and that said sales team had several pending

deals.  Countercl. ¶¶ 16, 18; Mot. at 16-17.  Second, Mr. Breckenfelder plausibly alleges that Counter-defendants knew these statements were false and did not have reasonable grounds to believe these statements were true.  *See* Countercl. ¶¶ 18, 20-25.  The Greenlight software had significant functionality problems and the Counter-defendants were aware of these issues, having failed repeatedly to deploy the software successfully at dealerships around the country.  *See id*. ¶¶ 20-25.  Also, upon arriving at Greenlight, Mr. Breckenfelder discovered there were no pending sales, nor was there an official sales team.  *Id.* ¶ 18.  Third, Mr. Breckenfelder specifically alleges that Counter-defendants made these false statements to induce him to join Greenlight as a sales executive.  *Id.* ¶¶ 15-16.  Fourth, Mr. Breckenfelder explains how he relied on these false statements by leaving his job to join Greenlight and sending Orbital a $50,000 payment for an equity share in Greenlight.  *Id.* ¶¶ 19.  If Mr. Breckenfelder had known of the full extent of Greenlight's software problems and nonexistent sales team, he would not have left his former job.  *Id.*  Lastly, Mr. Breckenfelder was damaged by these false statements as he lost the compensation he would have otherwise earned at his previous employer and never received any equity in Greenlight.  *Id.* ¶¶ 1,18, 66.

Mr. Breckenfelder has also pled these fraud claims with sufficient particularity.  *See Schreiber Distrib. Co.*, 806 F.2d at 1401.  For example, he provided the time, location, parties, and specific content of each statement.  *See e.g.*, ¶¶ 16, 18 ("In a number of telephone calls and/or emails . . . between late April and July 1, 2019, Rowen and Tullis represented to Breckenfelder that the Greenlight software was fully functional.").

The Greenlight valuation is also arguably a fraudulent misrepresentation.  *See Wilke v. Coinway, Inc.*, 64 Cal. Rptr. 845, 851-53 (Ct. App. 1967) (baseless statements about company's future income or profit were fraudulent); *Atalla v. Pham*, No. 19STCV24788, 2020 Cal. Super. LEXIS 1838, *12-13 (Super. Ct. Mar. 20, 2020) (appraisal or representation of a company's value can be an actionable misrepresentation).  Opinions can qualify as a false representation if the defendant (1) misrepresented the facts on which the opinion was based on or (2) implied the knowledge of facts that are actually non-existent.  *Wilke*, 64 Cal. Rptr. at 851.  Here, Counter-defendants allegedly asserted Greenlight had a valuation of $12.5 million from an independent

10

third-party appraiser.  Countercl. ¶ 26.  The Counter-defendants did not explicitly state the basis for this valuation, but they told Mr. Breckenfelder that they had "invested substantial capital into the company and had acquired 'multiple human resources' in order to grow the company."  *See id.* ¶ 18.  The Counter-defendants also mentioned that the Greenlight software was "ready to be marketed, sold, . . . and deployed at automotive dealerships."  *Id.* ¶ 16.  Presumably, these "facts" played some role in the company valuation, as they had an impact on Greenlight's future sales. *See id.* ¶¶ 18, 27.  However, these alleged facts were false.  *Id.* ¶ 18, 20.  As noted previously, the software was essentially non-functional, there were no customers, and Greenlight had no sales employees.  *Id.*  Thus, Counter-defendants misrepresented the facts on which the Greenlight valuation was based on.  *See Wilke*, 64 Cal. Rptr. at 851-53.

The Court therefore finds that Mr. Breckenfelder has adequately stated a claim for fraud, based on either intentional or negligent misrepresentation.

      b. <u>Conversion</u>

Mr. Breckenfelder brings a conversion claim based on his $50,000 equity payment. Countercl. ¶¶ 60-67.  "Conversion is the wrongful exercise of dominion" over another's property. *Mindys Cosms., Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010) (citing *Oakdale Vill. Grp. v. Fong*, 50 Cal. Rptr. 2d 810, 812 (Ct. App. 1996)).  To establish conversion, a plaintiff must show: "(1) the plaintiff's ownership or right to possession of the property at the time of the conversion, (2) the defendant's conversion by a wrongful act or disposition of property rights, and (3) damages."  *Id.*  Conversion is a strict liability tort and thus the defendant's knowledge or intent is immaterial to the legal analysis.  *Regent All. Ltd. v. Rabizadeh*, 180 Cal. Rptr. 3d 610, 612 (Ct. App. 2014).  Money can be the subject of a conversion, but only if it consists of a specific and identifiable amount.  *Haigler v. Donnelly*, 117 P.2d 331, 335 (Cal. 1941).  Under California law, successful conversion cases for money tend to "involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others."  *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 58 Cal. Rptr. 3d 516, 525 (Ct. App. 2007).

Mr. Breckenfelder has sufficiently pled his claim for conversion because he alleges

Counter-defendants wrongfully took a $50,000 equity payment from him, a specific and identifiable amount.  *See Hrothgar Invs., Ltd. v. Houser*, No. 15-CV-01116-JCS, 2015 WL 5853634, at *8 (N.D. Cal. Aug. 18, 2015) (valid conversion claim where plaintiff deposited funds with defendant, but defendant used the funds for reasons other than plaintiff's intended purpose). Mr. Breckenfelder made a $50,000 payment to Orbital for an equity interest in Greenlight but never received that equity, a fact that Counter-defendants acknowledge.  Countercl. ¶¶ 19, 61-65; Opp'n at 3 ("[N]or do Cross-Defendants dispute that Mr. Breckenfelder did contribute $50,000 to Greenlight as equity in the company, for which he has not received his equity interest to date."). Instead, Counter-defendants misappropriated Mr. Breckenfelder's equity payment for their own use.  Countercl. ¶¶ 63-65.  Moreover, Mr. Breckenfelder asserts that under section 17 of his employment agreement with Greenlight, this equity payment should have been returned after his employment with Greenlight ended.  *Id.* ¶ 63; Docket No. 98-3 ("Agreement") at 20.  Despite Mr. Breckenfelder's repeated demands for the return of his $50,000, Counter-defendants have failed to give the funds back and Mr. Breckenfelder has been damaged by this loss.  Countercl. ¶¶ 64, 66.

The Court therefore finds that Mr. Breckenfelder has adequately stated a claim for conversion because the Counter-defendants wrongfully took his $50,000 payment for their own personal use.

> c.  Failure to Pay Minimum Wage

Mr. Breckenfelder brings minimum wage claims under both federal and California law because he was not paid any wages while employed at Greenlight.  Id. ¶¶ 71, 79.  Both federal and state law require employers pay their employees a minimum wage.  *See* 29 U.S.C. § 206(a); Cal. Lab. Code § 1194.  Under federal law, employees should be paid the higher of either the federal or applicable state wage.  *See* 29 U.S.C. § 218(a).  Both the Counter-defendants and Mr. Breckenfelder agreed that California law would govern their employment agreement.  Countercl. ¶ 73; Agreement at 31.

Mr. Breckenfelder has sufficiently pled his minimum wage claims.  *See Barajas v. Carriage Servs., Inc.*, No. 19-CV-02035-EMC, 2019 WL 6699737, at *2 (N.D. Cal. Dec. 9, 2019) (plaintiff who did not receive any hourly wages even when she worked was "a clear violation of

United States District Court
Northern District of California

the minimum wage requirement"). Mr. Breckenfelder worked at Greenlight from July 15, 2019[1] to September 18, 2019 as a full-time employee, but was not paid any wages for his work. Countercl. ¶ 79. This was due to the Greenlight employment agreement, where Mr. Breckenfelder's entire compensation was tied to sales commissions. *See* Agreement at 18. Since Mr. Breckenfelder did not make any sales while employed at Greenlight, he did not receive any compensation. *See* Countercl. ¶ 79; Opp'n at 5. However, California law does not allow the minimum wage to be waived by a private agreement. *See* Cal. Lab. Code § 1194 ("Notwithstanding any agreement to work for a lesser wage, an employee receiving less than the legal minimum wage . . . applicable to the employee is entitled to recover in a civil action"); § 219 ("Nothing in this article shall in any way limit or prohibit the payment of wages at more frequent intervals, or in greater amounts . . . but no provision of this article can in any way be contravened or set aside by a private agreement."). Therefore, Mr. Breckenfelder is entitled to recover unpaid minimum wages and the associated wage law penalties for the nine weeks he worked at Greenlight. *See id.*

The Court therefore finds that Mr. Breckenfelder has adequately stated a claim for minimum wage and hour violations under California law because he was not paid any wages while he was employed at Greenlight.

3.     Fourth Factor:  Sum of Money at Stake

The fourth *Eitel* factor also weighs in favor of entering a default judgment because, as explained below, the request for monetary damages appears to be tailored to Counter-defendants' specific misconduct and supported by the evidence. *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal. 2002) ("[T]he Court must consider the amount of money at stake in relation to the seriousness of Defendant's misconduct."); *Walters*, 2004 U.S. Dist. LEXIS, at *8-9 (plaintiff supported damages calculation with paystubs and other documentation).

---

[1] The parties' agreement states that Mr. Breckenfelder's first day was August 1, 2019. *See* Agreement at 15-16. The counterclaim and Mr. Breckenfelder's undisputed testimony at the May 7, 2021 evidentiary hearing revealed that he in fact began working for GeenLight two weeks before that, on July 15, 2019. *See* Counterclaim ¶ 16.

4.      Fifth Factor:  Possibility of Dispute Concerning Material Fact

The fifth *Eitel* factor weighs in favor of default judgment because, although Counter-defendants disagree with the fraud claims and damages calculation, this dispute is not sufficient to prevent entry of default judgment.  *See Willamette*, 2014 U.S. Dist. LEXIS 148665, at *37; Opp'n at 3, 5-7.

Counter-defendants submitted an answer without affirmative defenses and admitting several material facts, including: (1) they reached out to Mr. Breckenfelder in order to offer him a job; (2) they made misrepresentations about the existence of a sales team; (3) Mr. Breckenfelder paid $50,000 to Orbital; (4) statements made in *Rowen v. Ansari* related to the software's functionality problems were true; and (5) the software had issues running on Internet Explorer. *See* Answer ¶¶ 15-16, 18-24, 30-31; *see Rasmussen v. Dublin Rarities*, No. C 14-1534 PJH, 2015 U.S. Dist. LEXIS 24260, * 46 (N.D. Cal. Feb. 27, 2015) (defendant's concession that certain allegations were true weighed in favor of default judgment).  In their opposition, Counter-defendants appear to concede the conversion claim, as they acknowledged Mr. Breckenfelder never received any equity for his $50,000 payment and these damages are valid.  *See* Opp'n at 3. And throughout this litigation, Counter-defendants have shown they are not likely to seriously defend this suit, having failed to respond to *any* discovery requests, in violation of numerous orders from this Court.  *See Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1005 (N.D. Cal. 2001) (defendants' failure to respond to discovery requests and missed conference dates weighed in favor of default judgment).  They have also missed several deadlines and meetings, including a settlement conference and the status conference held before the May 7, 2021 evidentiary hearing.  *See id.*

On the other hand, Counter-defendants filed an opposition to the motion for default judgment, suggesting there could be a material dispute as to the fraud claim.  *See* Opp'n at 3.  But Counter-defendants have failed to present any evidence that contradicts Mr. Breckenfelder's allegations in their opposition or at the May 7 evidentiary hearing.  *See IO Grp., Inc. v. Jordon*, 708 F. Supp. 2d 989, 999–1000 (N.D. Cal. 2010) (although defendant had appeared in the action and filed three documents, defendant's failure to present any evidence to contradict plaintiff's

United States District Court
Northern District of California

14

1    claim weighed in favor of default judgment).  Their opposition provides only conclusory

2    statements about the fraud claim without any substance to support their position.  *See Willamette*,

3    2014 U.S. Dist. LEXIS 148665, at *37 ("Defendants' naked averments are not sufficient to

4    overcome the ordinary rule in default judgment matters that the well-pleaded allegation . . . is

5    assumed to be true.").  Thus, this factor weighs in favor of default judgment.  *See id.*

6            5.      Sixth and Seventh Factors:  Excusable Neglect and Policy Favoring Decision on

7                    the Merits

8            The sixth *Eitel* factor also weighs in favor default judgment, because Counter-defendants

9    were properly served and were given notice of entry of default.  *See Shanghai Automation*, 194 F.

10   Supp. at 1005; Docket Nos. 18-19, 86.  Counter-defendants were clearly aware of this lawsuit and

11   their failure to litigate this matter is not based on excusable neglect.  *See Shanghai Automation*,

12   194 F. Supp. at 1005.

13           Lastly, although the seventh *Eitel* factor disfavors default judgment, default judgment

14   should still be granted based on the other factors.  *See Willamette*, 2014 U.S. Dist. LEXIS 148665,

15   at *40 (the seventh factor is not dispositive, given the "impossibility of deciding case on merits

16   when defendant fails to respond").  The seventh *Eitel* factor is based on the policy that "cases

17   should be decided upon their merits whenever reasonably possible."  782 F.2d at 1472.  However,

18   since a "discretionary standard is applied, default judgments are more often granted than denied."

19   *Webb v. Indigenous Global Dev. Corp.*, C-04-3174 MJJ, 2005 WL 1200203, at *5 (N.D. Cal. May

20   16, 2005) (citing *PepsiCo v. Triunfo-Mex, Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999)).  In this

21   case, Mr. Breckenfelder has adequately pled his claims and diligently contacted Counter-

22   defendants regarding discovery obligations, to no avail, making it unreasonably difficult to decide

23   this case on the merits.  *See id.*  Mr. Breckenfelder's allegations are indeed undisputed.  Thus, the

24   seventh factor does not weigh heavily against granting default judgment here.

25   C.      Relief

26           Since default judgment is warranted in this case, the Court must determine the amount of

27   damages.  *See* Fed. R. Civ. P. 55 (b)(2).  Once default has been entered, the Court must construe

28   all factual allegations, "except those relating to the amount of damages," as true.  *See Geddes*, 559

United States District Court
Northern District of California

1   F.2d at 560.  The relief granted "must not differ in kind from, or exceed in amount, what is

2   demanded in the pleadings."  Fed. R. Civ. P. 54(c).  The moving party also has the burden of

3   establishing the amount of damages and must provide actual evidence of damages.  *See United*

4   *States v. Sundberg*, No. C-09-4085 EMC, 2011 WL 3667458, at *6 (N.D. Cal. Aug. 22, 2011);

5   *Cannon v. City of Petaluma*, No. C 11-0651 PJH, 2011 WL 3267714, at *2 (N.D. Cal. July 29,

6   2011) ("[A] plaintiff is generally required to provide *admissible* evidence (including witness

7   testimony) supporting damage calculations." (emphasis added)).

8       The Court has discretion to hold a hearing on damages, especially when damages are

9   uncertain.  *See* Fed. R. Civ. P. 55(b)(2); *Dundee Cement Co. v. Howard Pipe & Concrete Prod.,*

10  *Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983) (hearing on damages is not necessary if "amount

11  claimed is liquidated or capable of ascertainment from definite figures contained in the

12  documentary evidence").  Under these circumstances, the Court can hold a hearing and evaluate

13  damages based on parties' declarations, oral testimony, or documentary evidence, such as receipts

14  or pay stubs.  *See Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) (affirming default

15  judgment with damages based on documentary evidence); *Fustok v. ContiCommodity Servs., Inc.*,

16  873 F.2d 38, 40 (2d Cir. 1989) (court has discretion to conduct hearings or rely on affidavits or

17  documentary evidence to determine damages).  If a hearing is held, the defaulting party is entitled

18  to contest the damages and to participate in the hearing.  *See Bonilla v. Trebol Motors Corp.*, 150

19  F.3d 77, 82 (1st Cir. 1998).  The Court held a hearing on damages.

20      Here, Mr. Breckenfelder is seeking compensatory damages for fraud, conversion, and

21  minimum wage claims, in addition to punitive damages.  Docket No. 95 ("Mot.") at 17, 19, 20-23,

22  27-29.  Also, Mr. Breckenfelder requests that the two previous Rule 37 sanctions be included in

23  this default judgment order, as the Counter-defendants have not made any payments on those

24  sanctions to date.  *Id.* at 28.  Each of these damages are discussed in detail below.

25      1.   Compensatory Damages for Fraud

26      For his fraud claims, Mr. Breckenfelder seeks compensatory damages based on: (1) lost

27  compensation and benefits that he would have received from CCC; (2) lost stock options in CCC;

28  and (3) his equity payment with prejudgment interest.  Mot. at 17, 29; Doc. No. 98

United States District Court
Northern District of California

1    ("Breckenfelder Decl.") ¶¶ 4-7, 15.  The Court will address each of these sources of compensatory

2    damages below.

3                    a.    Lost Compensation and Benefits

4          First, Mr. Breckenfelder seeks damages associated with his lost compensation and benefits

5    that he would have earned at CCC but for Greenlight's fraud.  Mot. at 17; Breckenfelder Decl. ¶¶

6    4-6.  Mr. Breckenfelder supports his calculation with his latest CCC pay stub and W-2 tax form

7    from the year 2019.  *See* Docket No. 98-1 ("W-2") at 10; Docket No. 98-2 ("Pay Stub") at 12-13;

8    Fed. R. Evid. 803(6).  In 2019, Mr. Breckenfelder worked at CCC from January 1, 2019 to July

9    12, 2019.  *See* Breckenfelder Decl. ¶ 4.  Mr. Breckenfelder claims he started working at Greenlight

10   between the dates of July 15, 2019 to September 18, 2019.  *Id.* ¶ 16.  After leaving Greenlight, Mr.

11   Breckenfelder appeared to do some short-term consulting work and was presumably paid as an

12   independent contractor, but Mr. Breckenfelder does not list the amounts he earned.  *Id.* ¶ 23

13   ("During this time, I have performed discrete consulting tasks for five different companies, but I

14   have not earned any W-2 wages for any of that work.").  At the May 7 evidentiary hearing, Mr.

15   Breckenfelder explained that he received roughly $10,000 (before taxes) in consulting income

16   since he left CCC.

17         From January to July 2019, Mr. Breckenfelder earned $205,996.86 in compensation and

18   $8,182.88 in benefits (*e.g.*, 401k match or health insurance) at CCC.  *See id*.  Thus, Mr.

19   Breckenfelder earned $1,109.74 per calendar day ($214,179.74 divided by 193 days).

20   Breckenfelder Decl. ¶¶ 4-6.  Mr. Breckenfelder calculated his lost compensation damages by

21   multiplying his daily earnings times 567 days (representing the period of July 12, 2019 (when he

22   left CCC) to January 28, 2021 (when he filed the instant motion)), resulting in $629,222.58

23   ($1,109.74 multiplied by 567 days).  *Id.*

24         The remaining question is whether it is reasonable to assume Mr. Breckenfelder would still

25   be working at CCC but for Counter-defendants' fraud, such that this Court should award him the

26   567 days of lost compensation he requests.  *See id.* at 739-40; *Helmer v. Bingham Toyota Isuzu*, 29

27   Cal. Rptr. 3d 136, 143-44 (Ct. App. 2005); *Toscano v. Greene Music*, 21 Cal. Rptr. 3d 732, 735

28   (Ct. App. 2004).  The *Helmer* and *Toscano* cases illustrate the difference between a lost wage

United States District Court
Northern District of California

17

1    calculation that is based on a reasonable number of days and one that is speculative.  In *Helmer*,

2    the court held that a lost wage calculation was reasonable because the plaintiff's former supervisor

3    had testified that the plaintiff was a "good and reliable employee."  29 Cal. Rptr. 3d at 140, 144.

4    The plaintiff left Lithia Automotive for a job at Bingham Toyota based on Bingham's false

5    promises related to pay and work conditions.  *Id.* at 138.  The plaintiff sued Bingham and won on

6    his claim of promissory fraud.  *Id.* at 141.  For his damages, the plaintiff based his lost wage

7    calculation on an extended period of time: the date he started working at Bingham to his future

8    retirement at the age of 61.  *Id.* at 140.  The court found this period was reasonable because the

9    plaintiff's former supervisor at Lithia had praised the plaintiff's work performance and stated he

10   would have rehired the plaintiff but for Lithia's strict no-rehire policy.  *Id.* at 144.  Thus, the court

11   held the damages award was "not too speculative or remote" because it was likely that the plaintiff

12   could have continued working at Lithia had it not been for Bingham's fraud.  *Id.*

13           Conversely, in *Toscano*, the court held that a lost wage calculation was too speculative

14   because the plaintiff did not have any expectation of returning to his prior employer.  21 Cal. Rptr.

15   3d at 740-41.  The plaintiff quit his job at Fields Piano on August 1, 2001 after Greene Music

16   offered him a sales management position.  *Id.* at 734-35.  The plaintiff was supposed to start

17   working on September 1, 2001, but before he could begin, Greene reneged on its employment

18   offer.  *Id.*  The plaintiff sued Greene for promissory estoppel and successfully won at trial.  *Id.* at

19   735.  The plaintiff requested lost wage damages based on two periods: (1) past losses from the

20   time the plaintiff quit his job at Fields to the trial date (August 1, 2001 to June 1, 2003) and (2)

21   future losses from June 2, 2003 to the plaintiff's retirement in 2017.  *Id.*  The appellate court

22   upheld the damages as they related to August 2001 because Greene had conceded it owed the

23   plaintiff at least one month's worth of lost compensation.  *Id.* at 740, n.3.  However, the court

24   vacated and remanded the damages award for the period of September 1, 2001 to 2017 because it

25   found these damages were "too speculative and remote."  *Id.*  Since plaintiff's employment at

26   Fields Piano was at will, it was unclear he could have continued working at Fields through 2017.

27   *Id.*  In particular, the court noted neither party had presented any testimony from the plaintiff's

28   supervisor at Fields.  *Id.*

United States District Court
Northern District of California

18

United States District Court
Northern District of California

At the evidentiary hearing, Mr. Breckenfelder justified why he is entitled to 567 days-worth of lost. He explained that, right before leaving CCC, he received praise for having a remarkable sales year in 2018. During 2019, Mr. Breckenfelder was on track to make close to $400,000, including a sizeable sales commission. He also testified that he never received a negative performance review and had no reason to believe he would not be able to continue working at CCC. Mr. Breckenfelder also testified that he could not return to CCC because his position was filled after he left and the company did not have other openings at his seniority level. Although Mr. Breckenfelder did not provide independent testimony from a supervisor or co-worker to corroborate his assessment of his employment prospects at CCC, he did provide documents showing his success as a salesperson there, including a pay slip showing a $73,000 bonus awarded to him due to his and the CCC's positive performance in 2018. The Court finds Mr. Breckenfelder's testimony credible. The Court has every reason to believe that Mr. Breckenfelder would still be employed at CCC but for Counter-defendants' fraud. *See id.* at 739–41; *Helmer*, 29 Cal. Rptr. 3d at 143-44.

Mr. Breckenfelder also submitted evidence at the May 7 evidentiary hearing that he spent an additional $13,086.10 to purchase insurance through the Consolidated Omnibus Budget Reconciliation Act (COBRA) in 2019 and 2020 ($477.22 in 2019 and $12,608.88 in 20202).

Accordingly, the Court concludes that Mr. Breckenfelder is entitled to $632,308.68 in lost compensation and benefits, which includes the $629,222.58 in lost compensation from CCC, plus $13,086.10 in additional out-of-pocket insurance costs, minus the $10,000 he earned in consulting fees since leaving CCC. *See e.g., Toscano*, 21 Cal. Rptr. 3d at 735 (lost wage damages are calculated by subtracting what individual could have earned at original company and actual earnings after fraud or breach occurred); *Lazar v. Superior Ct.*, 909 P.2d 981, 990 (Cal. 1996) (fraud plaintiffs may recover 'out-of-pocket' damages).

b.   Lost Stock Options in Previous Employer

Second, Mr. Breckenfelder seeks damages associated with options that he received while employed at CCC but was forced to sell to accept employment with Greenlight. Breckenfelder Decl. ¶ 7. At the evidentiary hearing, Mr. Breckenfelder testified and submitted supporting

United States District Court
Northern District of California

1    documentation that on July 10, 2017, as part of his compensation, he received 200 shares in a

2    CCC-affiliated holding company (Cypres Holdings, Inc. ("Cypress")) at a price of $1,000 per

3    share.  These shares vested at a rate of ten percent per year.

4         At the time Mr. Breckenfelder left CCC, twenty percent of the shares (*i.e.*, forty shares)

5    had vested.  Per his employment agreement, Mr. Breckenfelder had to sell these vested shares at

6    the market price when he left CCC, which was $1,560 per share, for a total of $62,400 (forty times

7    $1,560).  Mr. Breckenfelder also had to return the remaining 160 unvested shares to CCC.  Had

8    Mr. Breckenfelder stayed at CCC, thirty-five percent of his shares would have vested by January

9    15, 2021.  At the hearing, Mr. Breckenfelder testified that he had heard the market price for these

10   shares in January 2021 was $3,100 per share.  Counter-defendants correctly pointed out that this

11   purported price was hearsay, prompting Mr. Breckenfelder to clarify that he received an email

12   from a current CCC employee stating CCC shares were selling for $3,100 in January 2021.  In

13   response to Mr. Breckenfelder's confidentiality concerns, the Court allowed his counsel to file the

14   email under seal with the Court shortly after the May 7, 2021 evidentiary hearing, but the email

15   was never filed.

16        Because Mr. Breckenfelder never submitted that email or any other financial document

17   showing that the price of CCC shares was $3,100 in January 2021, the Court cannot properly

18   evaluate the value of CC shares at that time.  Accordingly, the Court will not award Mr.

19   Breckenfelder any compensatory damages for lost stock options in CCC.  *See Cannon*, 2011 WL

20   3267714, at *4 (conclusory allegations of money losses without additional evidence is not

21   sufficient to prove damages).

22              c.   Lost Equity Payment

23        Third, Mr. Breckenfelder seeks the return of his $50,000 equity payment with prejudgment

24   interest.  Mot. at 17-18, 29.  Mr. Breckenfelder supports this claim with his declaration, receipts of

25   the two wire transfers he made to Orbital Asset Holdings, Inc. ("Orbital") on June 24, 2019 and

26   July 8, 2019, and his testimony at the May 7, 2021 evidentiary hearing.  *See* Docket No. 98-4;

27   Fed. R. Evid. 803(6).  Moreover, Counter-defendants have acknowledged that Mr. Breckenfelder

28   made these payments and never received any equity in Greenlight.  *See* Docket No. 99 ("Opp'n")

at 3 ("[N]or do Cross-Defendants dispute that Mr. Breckenfelder did contribute $50,000 to Greenlight as equity in the company, for which he has not received his equity interest to date.").

California law allows individuals to recover prejudgment interest when damages are certain or "capable of being made certain by calculation" and the right to recover such damages is vested in the individual on a certain day. Cal. Civ. Code § 3287(a). Under Section 3287(a), damages are certain when the defendant knows the amount owed or could have calculated the amount based on reasonably available information. *See Children's Hosp. & Med. Ctr. v. Bonta*, 118 Cal. Rptr. 2d 629, 654-55 (Ct. App. 2002). The Court has discretion to award prejudgment interest. *See* Cal. Civ. Code § 3288; Cal. Const. Art. 15 § 1 (applicable interest rate is seven percent per annum).

Here, the lost equity damages are reasonable and supported by adequate evidence. In addition to the $50,000 payment, the Court grants prejudgment interest because the amount of damages is certain. *See Children's Hosp.*, 118 Cal. Rptr. 2d at 654-55. The two receipts confirm the dates and amounts transferred plus the Counter-defendants have also acknowledged that they owe these damages to Mr. Breckenfelder. *See Walters v. Shaw/Guehnemann Corp.*, No. 03-cv-04058, 2004 U.S. Dist. LEXIS 11992, at *8-9 (N.D. Cal. Apr. 15, 2004) (plaintiff supported damages calculation with paystubs and other documentation).

Accordingly, the Court finds that Mr. Breckenfelder is entitled to $50,000 in lost equity damages plus prejudgment interest in the amount of $5,235.62, for a total of $55,235.62.

2.    Compensatory Damages for Conversion

For his conversion claim, Mr. Breckenfelder is requesting an additional $55,235.62 in damages and prejudgment interest due to his lost equity payment. Mot. at 18-19. But Mr. Breckenfelder's equity payment is already accounted for in his fraud damages and additional damages would be duplicative. *See Theme Promotions*, 546 F.3d at 1005; *Tavaglione v. Billings*, 847 P.2d 574, 580 (Cal. 1993) ("Regardless of the nature or number of legal theories advanced by the plaintiff, he is not entitled to more than a single recovery for each distinct item of compensable damage"). The Court therefore denies this request because it constitutes double recovery. *See Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1005 (9th Cir. 2008) ("[G]eneral

United States District Court
Northern District of California

1    rule of compensatory damages bars double recovery for the same wrong.").

2           3.      Compensatory Damages for Wage and Hour Claims

3           For his wage and hour claims, Mr. Breckenfelder is seeking damages based on violations

4    of four provisions of the California Labor Code: (1) unpaid minimum wages in violation of section

5    1194; (2) failure to provide itemized wage statements in violation of section 226(a); (3) failure to

6    provide payroll records in violation of section 226; and (4) a waiting time penalty under sections

7    202 and 203.[2]  Mot. at 19-23.  The Court will address each of these sources of compensatory

8    damages below.

9                  a.      Unpaid Minimum Wage

10          First, Mr. Breckenfelder is seeking any minimum wages that Greenlight failed to pay him.

11   Mot. at 19-21; Cal. Lab. Code § 1194.  But Mr. Breckenfelder is already receiving damages for his

12   fraud claim that account for his lost compensation and benefits at CCC.  The Court therefore

13   denies his request for unpaid minimum wages because it constitutes double recovery.  *See Theme*

14   *Promotions*, 546 F.3d at 1005 ("[G]eneral rule of compensatory damages bars double recovery for

15   the same wrong.").

16                 b.      Failure to Provide an Itemized Wage Statement

17          Second, Mr. Breckenfelder is seeking an itemized wage statement penalty under section

18   226(a) of the California Labor Code.  Mot. at 15–16.  In California, employers must provide

19   employees with regular itemized wage statements.  Cal. Lab. Code § 226(a).  Under Section

20   226(e)(1), an employee that does not receive these statements as a result of a "knowing and

21   intentional failure by an employer to comply with the Labor Code" can recover the greater of (1)

22   all actual damages or (2) $50 for the initial pay period when a violation occurs and $100 for each

23   violation in a subsequent pay period, up to $4,000 maximum.  *Id.* § 226(e)(1).  Thus, to recover

24   damages under Section 226(e), three elements must be satisfied: (1) a violation of section 226(a);

25

26   _____

27   [2] Breckenfelder asserts that he is seeking waiting time penalties under sections 201 and 203.  But
     Section 201 refers to employees who were discharged or laid off.  *See* Cal. Lab. Code § 201.
     Because Mr. Breckenfelder voluntarily left Greenlight, section 202 is more appropriate as it relates
28   to employees who resigned.  *See* Cal. Lab. Code § 202.  Therefore, the Court will assess Mr.
     Breckenfelder's waiting time penalty under sections 202 and 203.

United States District Court
Northern District of California

(2) the violation must be "knowing and intentional"; and (3) an injury. *Willner v. Manpower Inc.*, 35 F. Supp. 3d 1116, 1128 (N.D. Cal. 2014). A "knowing and intentional failure does not include an isolated and unintentional payroll error due to a clerical or inadvertent mistake." Cal. Lab. Code § 226(e)(2)(f).

Here, Mr. Breckenfelder easily satisfies the first and third elements as he never received itemized wage statements, and this qualifies in itself as an injury under Section 226(a). *See* Mot. at 21; Cal. Lab. Code § 226(e)(2)(A) ("[E]mployee deemed to suffer injury … if employer fails to provide a wage statement."). As for "knowing and intentional," there are currently two lines of cases that establish what is necessary to satisfy this element. *See Arroyo v. Int'l Paper Co.*, No. 17-cv-06211-BLF, 2020 U.S. Dist. LEXIS 32069, at *33-39 (N.D. Cal. Feb. 24, 2020). For the majority view, "an employer's good faith belief that it is not violating the California Labor Code precludes a finding of a knowing and intentional violation." *Magadia v. Wal-Mart Assocs., Inc.*, 384 F. Supp. 3d 1058, 1082 (N.D. Cal. 2019). In contrast, for the minority view, "knowing and intentional" simply requires "that the defendant knew . . . facts existed that brought its actions or omissions within the provisions of section 226(a)," *i.e.*, in this case, Counter-defendants knew they were not providing itemized wage statements. *See Willner*, 35 F. Supp. 3d at 1131; *Garnett v. ADT LLC*, 139 F. Supp. 3d 1121, 1133 (E.D. Cal. 2015) ("[A] plaintiff is not required to demonstrate that the employer knew that its conduct was unlawful."). Here, "knowing and intentional" is satisfied under either test. *See id.*; *Magadia*, 384 F. Supp. 3d at 1082. Currently, Counter-defendants have failed to raise any defense in either their answer or opposition. *See* Docket No. 20 ("Answer") ¶ 76; *see generally*, Opp'n. As for the second test, Counter-defendants have acknowledged they paid Mr. Breckenfelder nothing and presumably knew they were not providing wage statements. *See id.* ¶ 37.

Mr. Breckenfelder correctly calculates that he is entitled to $450 for Counter-defendants' failure to provide him with an itemized wage statement ($50 for the first wage statement plus $400 for the remaining four two-week pay periods he worked at Greenlight). Accordingly, the Court finds that Counter-defendants must pay Mr. Breckenfelder a $450 penalty under section 226(a) for failing to provide him with an itemized wage statements while working at Greenlight.

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

c.      Failure to Keep Payroll Records

Third, Mr. Breckenfelder is seeking a penalty against Counter-defendants for failing to

maintain payroll records pursuant to section 226 of the California Labor Code.  Mot. at 16-17.

Under Section 226, employers are required to maintain these records for a period of three years

and provide employees with a copy of these records upon request.  Cal. Lab. Code § 226.  If an

employer refuses to provide a copy of the records within 21 days, there is a $750 penalty.  *Id.* §

226 (f).

Here, it is undisputed that Counter-defendants did not maintain any records of Mr.

Breckenfelder's employment.  Accordingly, the Court finds that Counter-defendants must pay Mr.

Breckenfelder a $750 penalty under section 226.

d.      Waiting Time Penalty

Fourth, Mr. Breckenfelder is seeking a penalty under sections 202 and 203 because

Counter-defendants failed to pay all his wages upon discharge (also known as a "waiting time

penalty").  *See* Mot. at 16.  In California, if employers willfully fail to pay wages upon discharge,

the employee can receive a penalty equal to one day of wages until the final wages are paid, up to

a maximum of 30 days.  Cal. Lab. Code § 203(a).  Willful in this context simply means "the

employer intentionally failed or refuse to perform an act *which was required to be done*."  *Barnhill*

*v. Robert Saunders & Co.*, 177 Cal. Rptr. 803, 806 (Ct. App. 1981) (employers do not need an

intent to defraud to violate section 203).

Here, Mr. Breckenfelder qualifies for the waiting time penalty under sections 203 because

it is undisputed that he was not paid minimum wages upon resigning.  *See Diaz*, 233 Cal. Rptr. 3d

at 531-32.  The fact that Mr. Breckenfelder may not recover wages from Counter-defendant

because it would constitute double recovery does not bar the waiting time penalty.  Counter-

defendant was obligated to pay him wages in a timely manner – the fact that recovery of those

wages is denied as a legal remedy in this litigation does not negate Counter-defendant's obligation

at the time of Mr. Breckenfelder's employment and resignation.  Moreover, section 203 is

designed as a penalty, and the basis for that penalty here is not obviated by the double recovery

bar in this litigation.  Accordingly, the Court finds that Counter-defendants must pay Mr.

United States District Court
Northern District of California

1    Breckenfelder a $2,640 penalty ($11 per hour times eight hours per day, times thirty days) under

2    Section 203.

3              e.      Prejudgment Interest

4              Mr. Breckenfelder contends that he is entitled to prejudgment interest on any damages he

5    recovers for Counter-defendants' violations of the California Labor Code.  But California law

6    clearly explains that employees are only entitled to prejudgment interest for unpaid wages, not

7    penalties.  *See Naranjo v. Spectrum Sec. Servs., Inc.*, 253 Cal. Rptr. 3d 248, 266 (2019) ("[C]auses

8    of action for waiting time and itemized wage statement penalties, like causes of actions . . . for the

9    nonprovision of meal or rest breaks, do not seek to collect due and unpaid wages.") (citing *Lane v.*

10   *Francis Cap. Mgmt. LLC*, 168 Cal. Rptr. 3d 800, 806 (2014))); *In re: Autozone, Inc.*, No. 3:10-

11   MD-02159-CRB, 2016 WL 4208200, at *7 (N.D. Cal. Aug. 10, 2016) ("Waiting time penalties

12   also cannot form the basis for prejudgment interest because such penalties are not wages."); Cal.

13   Lab. Code 218.6 ("In any action brought for the nonpayment of wages, the court shall award

14   interest on all due and unpaid wages.").   Therefore, Mr. Breckenfelder is not entitled to

15   prejudgment interest on any damages he receives under sections 206(a), 206(f), and 203, because

16   those damages are penalties, not unpaid wages.

17             f.      Mr. Rowen's Personal Liability for Wage and Hour Claims

18             Mr. Breckenfelder also asserts that Mr. Rowen should be held personally liable under

19   section 558.1 of the California Labor Code for Counter-defendants' penalties under sections

20   206(a), 206(f), and 203.  Indeed, Section 558.1(a) provides that any "other person acting on behalf

21   of an employer[] who violates, or causes to be violated, any provision regulating minimum wages

22   or hours and days of work in any order of the Industrial Welfare Commission . . . or [Labor Code]

23   Sections 203, 226, 226.7, 1193.6, 1194 or 2802, may be held liable as the employer for such

24   violations."  Cal. Lab Code § 558.1(a).  Section 558.1(b), in turn, defines "other person" as "a

25   natural person who is an owner, director, officer, or managing agent of an employer."  *Id.*

26             The law is unclear on whether individual officers can be held personally liable for wage

27   and hour penalties under section 558.1 in a private right of action.  *Reynolds v. Direct Flow Med.,*

28   *Inc.*, No. 17-CV-00204-KAW, 2019 WL 1084179, at *7 (N.D. Cal. Mar. 7, 2019) (describing

United States District Court
Northern District of California

25

1  California court split on Section 558.1(a)).  Some courts have held section 558.1 only authorizes

2  the Labor Commissioner to impose civil penalties because section 558, which predates and

3  immediately precedes section 558.1, refers only to actions that can be undertaken by the Labor

4  Commissioner.  *See e.g., Sassani v. KLP Enters.*, Case No. CGC-17-557841, 2017 Cal. Super.

5  LEXIS 2950, at *2 (Nov. 16, 2017) ("[S]ection 558.1 was intended to provide an additional

6  avenue of recourse to the Labor Commissioner to enforce judgments for Labor Code violations.");

7  *Delfin v. ASD Estates, Inc.*, Case No. CIV537203, 2017 Cal. Super. LEXIS 8867, at *3 (May 2,

8  2017) ("Labor Code §§ 558 and 558.1 . . . indicate that the Labor Commissioner is authorized to

9  take certain actions, and are silent as to any private right of action.").  Conversely, other courts

10  have held Section 558.1 applies to a private cause of action due to the plain language of the

11  statute:

12       a) Any employer or other person acting on behalf of an employer,
who violates, or causes to be violated, any provision regulating

13  minimum wages or hours and days of work in any order of the
Industrial Welfare Commission, or violates, or causes to be violated,

14  Sections 203, 226, 226.7, 1193.6, 1194, or 2802, *may be held liable*
as the employer for such violation.

15

16       (b) For purposes of this section, the term "other person acting on
behalf of an employer" is limited to a natural person who is an

17  owner, director, officer, or managing agent of the employer, and the
term "managing agent" has the same meaning as in subdivision (b)
of Section 3294 of the Civil Code.

18

19  Cal. Lab. Code §558.1 (emphasis added); *see e.g., Rangel v. RTI Props.*, Case No. BC641439,

20  2017 Cal. Super. LEXIS 8016, at *3, 2017 WL 2345874 (May 3, 2017) ("[T]he plain language of

21  the statute does provide a private right of action.").

22       Because the law is unclear on the application of § 558.1 to private causes of action, the

23  Court will not hold Mr. Rowen personally liable for Counter-defendants' wage and hour penalties.

24       4.   <u>Punitive Damages</u>

25       Mr. Breckenfelder seeks approximately $687,544.3 in punitive damages based on his fraud

26  and conversion claims.  Mot. at 21-22.  This amount is based on two factors: (a) Greenlight's

27  asserted valuation of $12.5 million and a one-to-one ratio of punitive damages to compensatory

28  damages of the same amount.  *Id.*

1       "The purpose of punitive damages is to punish wrongdoers" and deter wrongful acts.  *Neal*

2   *v. Farmers Ins. Exch.*, 582 P.2d 980, 990, n.13 (Cal. 1978).   Under California law, punitive

3   damages are available only when the plaintiff can prove "by clear and convincing evidence that

4   the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  Courts

5   have significant discretion in awarding punitive damages and should consider three factors: "(1)

6   the nature of defendants' acts; (2) the amount of compensatory damages awarded; and (3) the

7   wealth of the defendants."  *See Pro. Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council,*

8   *Inc.*, 727 F.2d 1470, 1473 (9th Cir. 1984) (citing *Neal*, 582 P.2d at 990).

9       In this case, the first two factors are satisfied, because Counter-defendants committed fraud

10  and the punitive damages are in a one to one ratio with the compensatory damages.  *See Helmer*,

11  29 Cal. Rptr. 3d at 141 (granting punitive damages award where employer committed fraud to

12  induce plaintiff to join company); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425

13  (2003) (single digit ratios of compensatory to punitive damages "likely to comport with due

14  process").  However, Mr. Breckenfelder has not met his burden of proving Counter-defendants'

15  wealth allows them to cover these damages.  *See* Breckenfelder Decl. ¶ 11.

16      The defendants' wealth is an essential factor for determining deterrence, and it is a

17  necessary element for the court to determine the appropriate amount of punitive damages.  *See*

18  *Adams v. Murakami*, 813 P.2d 1348, 1350-51 (Cal. 1991).  Various indicators can be used to

19  represent a defendants' wealth including net worth or net income.  *See Green v. Laibco, LLC*, 121

20  Cal. Rptr. 3d 415, 423-24 (Ct. App. 2011); *see also Baxter v. Peterson*, 58 Cal. Rptr. 3d 686, 691

21  (Ct. App. 2007) ("Normally, evidence of liabilities should accompany evidence of assets, and

22  evidence of expenses should accompany evidence of income.").  Evidence that a defendant has a

23  negative net worth, especially one based on accounting losses, does not preclude a punitive

24  damages award.  *See Zaxis Wireless Commc'ns, Inc. v. Motor Sound Corp.*, 107 Cal. Rptr. 2d 308,

25  310, 312-13 (Ct. App. 2001); *but see ENA N. Beach, Inc. v. 524 Union St.*, 256 Cal. Rptr. 3d 426,

26  442 (Ct. App. 2019) (lack of evidence of defendant's ability to pay without being "destroyed" can

27  preclude punitive damages).

28      Although Mr. Breckenfelder tries to use Greenlight's valuation as a proxy for the Counter-

United States District Court
Northern District of California

1    defendants' net worth, the Court cannot rely solely on this value, particularly because Counter-

2    defendants offered competing evidence.  Indeed, at the evidentiary hearing Mr. Rowen testified

3    that neither he nor Greenlight or Orbital have any assets, revenue, sales, or potential customers.

4    Moreover, Mr. Breckenfelder himself has asserted the $12.5 million valuation was a fraudulent

5    misrepresentation.  *See e.g.*, Countercl. ¶ 17.  Moreover, this valuation provides minimal insight

6    into the Counter-defendants' actual assets or liabilities *i.e.,* their ability to pay punitive damages.

7    *See Kelly v. Haag*, 52 Cal. Rptr. 3d 126, 129-30 (Ct. App. 2006) (defendant's out of court

8    statements as to what he owned was not sufficient to establish net worth); *Soto v. BorgWarner

9    Morse TEC Inc.*, 191 Cal. Rptr. 3d 263, 286-87 (Ct. App. 2015) (evidence sufficient to establish

10   net worth must reflect defendant's actual ability to pay punitive damages).

11         Accordingly, the Court declines to award any punitive damages in the instant case.

12   D.    Alter Ego Liability

13         Mr. Breckenfelder also asserts that Greenlight and Orbital are alter egos of Andrew Rowen

14   under California alter ego law for purposes of his fraud and conversion claims.  Mot. at 17-21.  To

15   support his claim, Mr. Breckenfelder points to several factors, including shared common

16   ownership, commingling of resources, and how the companies represent themselves publicly as a

17   single entity.  *Id.*  Since Counter-defendants refused to participate in discovery, Mr. Breckenfelder

18   relied on pleadings from this case and statements from other lawsuits.  *Id.*

19         Before evaluating the merits of Mr. Breckenfelder's claim, the Court will first consider the

20   law that will apply to its alter ego analysis.  *See Wehlage v. EmpRes Healthcare Inc*., 821 F. Supp.

21   2d 1122, 1126 (N.D. Cal. 2011) (choice-of-law issue when limited liability companies

22   incorporated outside the forum state).  When determining whether alter ego liability applies,

23   federal courts apply the law of the forum state.  *See In re Schwarzkopf*, 626 F.3d 1032, 1036–37

24   (9th Cir. 2010) (applying state alter ego law in a federal bankruptcy case).  In this case, California

25   alter ego law will apply to Orbital, a corporation incorporated and based in California.  *See id*.

26   However, Greenlight is an Ohio limited liability company and Ohio law should apply because of

27   California Corporations Code section 17708.01, dictates that the law of the state where a foreign

28   limited liability company is formed governs the liability of its members and managers.  *See*

28

*Wehlage*, 821 F. Supp. 3d at 1128 (applying §17.708.01's predecessor statute and finding alter ego liability dictated by incorporation state); *MacRae v. HCR Manor Care Servs., LLC*, No. SACV140715DOCRNB, 2017 WL 11480091, at *3 (C.D. Cal. Sept. 14, 2017) (same analysis but with §17.708.01).   Essentially, when a "statute dictates choice-of-law, the court does not need to apply a common law choice-of-law analysis," such as California's governmental interest test.  *See Wehlage*, 821 F. Supp. 3d at 1128 (citing *Barclays Discount Bank Ltd. v. Levy*, 743 F.2d 722, 725 (9th Cir. 1984)).  Instead, the court can rely on the statute.  *Id.*  Here, Section 17708.01 states:

> (a) The law of the state or other jurisdiction under which a foreign limited liability company is formed governs all of the following:
>
> (1) The organization of the limited liability company, its internal affairs, and the authority of its members and managers.
>
> (2) *The liability of a member as member and a manager as manager for the debts, obligations, or other liabilities of the limited liability company.*

Cal. Corp. Code § 17708.01 (emphasis added).  Hence, the state of incorporation governs the liability of the members and managers of a limited liability company and thus alter ego liability as well.  *See Wehlage*, 821 F. Supp. 3d at 1128.  Therefore, when analyzing Mr. Breckenfelder's alter ego claim, the Court applies Ohio law to Greenlight and California law to Orbital.

        1.    <u>Greenlight is Mr. Rowen's Alter Ego</u>

      Under Ohio law, a court may disregard the corporate form and pierce the corporate veil where the plaintiff can show three elements are satisfied:

> "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own,
>
> (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and
>
> (3) injury or unjust loss resulted to the plaintiff from such control and wrong."

*Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St. 3d 274, 289 (1993).  For the first prong, courts consider several factors including: "(1) whether corporate formalities are observed, (2) whether corporate records are kept, (3) whether corporate funds were

1   commingled with personal funds, and (4) whether corporate property was used for a personal

2   purpose." *My Father's House No. 1 v. McCardle*, 986 N.E.2d 1081, 1089 (Ohio Ct. App. 2013);

3   *Denny v. Breawick, LLC*, 137 N.E.3d 578, 584 (Ohio Ct. App. 2019).

4        In this case, Mr. Breckenfelder satisfied the first prong because Mr. Rowen controls

5   Greenlight.  *See Denny*, 137 N.E. 3d at 585-86 (affirming alter ego liability when there was

6   common ownership of LLC and defendant did not follow corporate formalities).  Mr. Rowen

7   testified that he is the CEO of Greenlight and owns seventy percent of that company.  *See id.;*

8   Mot. at 21.  Second, Mr. Rowen did not maintain separate operations or observe corporate

9   formalities.  *See Denny*, 137 N.E. 3d at 586; Mot. at 17-19.  For example, Mr. Rowen asserted that

10  the Greenlight software was made for him and was his own personal property.  *See Mot.* at 17-19.

11  When there was a contractual dispute regarding Greenlight software, Mr. Rowen sued the software

12  developers under his own name, rather than under Orbital, the company that had developed and

13  funded Greenlight.  *See id.*  There also appeared to be potential blending of financial resources, as

14  Mr. Rowen asserted in the *Ansari* suit that he personally funded Greenlight software, even though

15  in this action he stated that Orbital developed and "expanded substantial sums in developing the

16  Greenlight software."  *See id.*  Moreover, the companies appeared to present themselves as a

17  single entity, with an employee stating she worked at Greenlight in June 2015, but Orbital was its

18  name at the time.  *See id.* at 25.  Considering the company's ownership, lack of corporate

19  formalities, and the use of corporate property for personal purposes, the first prong is satisfied.

20  *See Denny*, 137 N.E. 3d at 585-86.

21       The other two prongs of the veil-piercing test are also likely satisfied.  *See Denny*, 137

22  N.E. 3d at 586-587.  As noted above, Counter-defendants committed fraud when they made false

23  misrepresentations to Mr. Breckenfelder regarding the condition of Greenlight's software and

24  work conditions, which is sufficient to satisfy the second prong.  *See id*. (defendant's violation of

25  home construction law were "illegal acts" that satisfy this prong under Ohio law).  For the third

26  prong, Mr. Breckenfelder has shown that Counter-defendants' fraud was the cause of his damages.

27  *See id*.  In other words, but for Counter-defendants' misrepresentations, Mr. Breckenfelder would

28  not have left his job at CCC nor would he have made an equity payment to Orbital.  *See id.*

United States District Court
Northern District of California

30

1    Accordingly, the Court concludes that Greenlight is an alter ego of Mr. Rowen for

2    purposes of Mr. Breckenfelder's fraud and conversion claims because all three prongs of the test

3    are satisfied.

4        2.    Orbital is Mr. Rowen's Alter Ego

5    Under California law, a court may disregard the corporate form and pierce the corporate

6    veil where the plaintiff can show two elements are satisfied: "(1) such a unity of interest and

7    ownership between the corporation and its equitable owner that no separation actually exists and

8    (2) an inequitable result if the acts in question are treated as those of the corporation alone."

9    *Automotriz Del Golfo De California S. A. De C. V. v. Resnick*, 306 P.2d 1, 3 (Cal. 1957).

10    For the first prong, courts consider several factors including: (1) commingling of funds and

11    other assets, (2) treatment by an individual of the assets of a corporation as his own; (3) identical

12    directors and officers; (4) failure to maintain minutes or corporate records; (5) inadequate

13    capitalization; and (6) use of one as a mere shell or conduit for the affairs of the other.  *Leek v.*

14    *Cooper*, 125 Cal. Rptr. 3d 56, 69–70, (Ct. App. 2011).  A plaintiff does not need to satisfy all the

15    factors to establish alter ego liability.  *Updateme Inc. v. Axel Springer SE*, No. 17-CV-05054-SI,

16    2018 WL 1184797, at *10 (N.D. Cal. Mar. 7, 2018).

17    As noted above under the first prong of the Greenlight analysis, Mr. Breckenfelder has

18    unity of interest and owns Orbital.  *See Cadence Design Sys., Inc. v. Pounce Consulting, Inc.*, No.

19    17-CV-04732-PJH (SK), 2019 WL 1768619, at *4 (N.D. Cal. Apr. 1, 2019) (finding alter ego

20    when companies had shared ownership, commingled funds, and minimal corporate formalities).

21    Mr. Rowen's testimony at the evidentiary hearing reveals that he does not observe corporate

22    formalities for Orbital, including maintaining minutes of corporate records, treats the individual

23    assets of Orbital as his own, Orbital has inadequate capitalization, and it appears he is using the

24    company as a mere shell to conduct his affairs.

25    The second prong of the alter ego test is also satisfied because to treat these entities

26    separately would lead to "an inequitable result."  *See Cadence*, 2019 WL 1768619, at *4 (finding

27    alter ego liability necessary to prevent defendant from avoiding liability after defendant had lied

28    about its relationship with subsidiary); *Neilson v. Union Bank of California, N.A.*, 290 F. Supp. 2d

United States District Court
Northern District of California

31

1101, 1117 (C.D. Cal. 2003) ("California courts generally require some evidence of bad faith conduct on the part of defendants" before imposing alter ego liability). Here, Counter-defendants—and especially Mr. Rowen—committed fraud when they made demonstrably false statements to convince Mr. Breckenfelder to leave his job and join Greenlight. *See* Mot. at 15-17. To allow Mr. Rowen to continue hiding his fraud behind the corporate form would perpetuate injustice against Mr. Breckenfelder.

Accordingly, the Court concludes that Orbital is also an alter ego of Mr. Rowen for purposes of his fraud and conversion claims.

## III.   **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Mr. Breckenfelder's motion for default judgment and awards the following relief: (1) $687,544.3 in compensatory damages for fraud and conversion against all Counter-defendants; (2) $3,840 in compensatory damages for wage and hour violations of the California Labor Code against Greenlight only; (3) $6,137.50 in unpaid sanctions pursuant to this Court's June 2, 2020 order against all Counter-defendants, *see* Docket No. 35; and (4) $37,346.25 in unpaid sanctions pursuant to this Court's December 9, 2020 order against all Counter-defendants, *see* Docket No. 89.

This order disposes of Docket No. 95. The Clerk of the Court is instructed to enter a final judgment in accordance with the above and close the file in this case.

**IT IS SO ORDERED**.

Dated: June 28, 2021

_____
EDWARD M. CHEN
United States District Judge